**DiSABATO & CONSIDINE LLC**
David J. DiSabato, Esq.
P.O. Box 370, Rutherford, New Jersey 07070
Phone: 201.762.5088
Fax: 973.453.0338
*ddisabato@disabatolaw.com*

*Attorneys for Plaintiff Tina M. Lockhart, and*
  *All Others Similarly Situated*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| TINA M. LOCKHART, on behalf of herself and all others similarly situated,<br><br>Plaintiffs<br><br>vs.<br><br>DORRANCE PUBLISHING COMPANY, INC.,<br><br>Defendant | Civil Action<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff Tina M. Lockhart, with an address of 41 Kelsey Avenue, Trenton, New Jersey 08618-3122 ("Plaintiff"), through her undersigned attorneys, by way of Complaint, states and alleges matters pertaining to herself and her own acts, upon personal knowledge, and as to all other matters, upon information and belief, based upon the investigation undertaken by her counsel, as follows:

**NATURE OF THE ACTION**

1.      Plaintiff is the accomplished author of the 2008 young-adult novel "Ten Houses Filled with Leaves."  She published her novel through Dorrance Publishing Company, Inc. pursuant to a contract under which Dorrance agreed to publish, print, market and distribute the

novel. In return, Dorrance was to retain 60% of all domestic sales and 75% of all international sales.

2. In 2015, Dorrance terminated the contract and informed Plaintiff that, since 2008, only nine (9) copies of her novel had been sold.

3. However, in the Fall of 2019, Plaintiff discovered that tens of thousands of copies of her novel had actually been sold, and that Dorrance had hidden all sales records from her and had retained all profits as well. In fact, for just a four week period in 2012, a total of 51,133 copies of Plaintiff's book were sold.

4. Dorrance actively hid Plaintiff's true sales from her and deceived her into thinking that her book had virtually no sales, all the while retaining the revenue from the substantial sales numbers that Plaintiff's book was actually generating.

## PARTIES

5. Plaintiff Tina Lockhart is an individual residing at 41 Kelsey Avenue, Trenton, New Jersey 08618, and is a "consumer" within the meaning of the New Jersey Consumer Fraud Act, at N.J.S.A. 56:8-1(d).

6. Defendant Dorrance Publishing Company, Inc. ("Dorrance" or "Defendant") is an active Domestic Business Corporation, organized under the laws of the Commonwealth of Pennsylvania, with a main office address and principal business address of 585 Alpha Drive, Suite 103, Pittsburgh, Pennsylvania 15238.

## JURISDICTION AND VENUE

7. This action is brought as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

8. This Court has subject matter jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. § 2201, and pursuant to 28 U.S.C. § 1332(a)(1) in that the amount in controversy exceeds the sum or value of $75,000 and the parties are citizens of different states.

9. This Court also has subject matter jurisdiction over all causes of action herein pursuant to 28 U.S.C. § 1332(d), as this is a putative class action with minimal diversity and an amount in controversy exceeding $5,000,000.

10. This Court has jurisdiction over Defendant because it does substantial business in this District, holding itself out publically to citizens of the State of New Jersey and contracting with citizens of the State of New Jersey, including Plaintiff.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) & (2), as acts and/or omissions giving rise to Plaintiffs' claims occurred in this District; Defendant maintains and oversee agents or representatives in this District; and Defendant has conducted business activities on an ongoing basis in this District at all times material hereto.

## FACTUAL ALLEGATIONS

12. In early 2008, Plaintiff contacted Defendant in order to arrange for the publication of Plaintiff's novel "Ten Houses Filled with Leaves."

13. Established in 1920, Defendant offers publishing services for authors and aspiring authors and claims to be the oldest publishing services company in America.

14. Defendant serves the entire United States and markets its services to individuals who do not wish to work with a traditional commercial publisher:[1]

> Our philosophy is simple: the freedom to publish should be available to everyone with something to communicate. A book created for a few people is as worthy of publication as a book written for millions.

---

[1] *https://www.dorrancepublishing.com/about/why-dorrance/*

> We'll work with you to customize a turnkey publishing package – including full-service production and distribution, and limited or full-service promotion – that's right for your book.

15. Among the services that Defendant promises to provide is wide distribution of authors' books through many widespread channels, including, for example, Amazon:

> **Our Book Distribution, Merchandising, and Fulfillment team gets to work making sure your book is available at leading book retailers.** There are plenty of ways for readers to order your book. We fulfill orders from the Dorrance Bookstore, Amazon.com, the Kindle Store, Ingram Lightning Source, Baker & Taylor, Bowker's Books in Print, and Google Bookstore. We distribute your book both in printed and e-book format.

16. Defendant further promises to fulfill all orders and handle all incoming payment when books are ordered:

> **Your book is finally on its way to bookstores and readers!** We'll package and ship orders directly from our warehouse. We also keep a close eye on shipping and notify the buyers when their shipments are on the way. In case any consumer has questions about orders, our customer service team is available to them through our toll-free number.
>
> **We make sure that orders are processed and payment is received.** Orders often come in via mail, fax, online forms or telephone. Buyers can pay for your book in any number of ways: credit card, electronic check, money orders, wire transfer or PayPal.

17. Defendant's services come at a steep cost - Plaintiff paid Defendant $8,000 in connection with the publication of "Ten Houses Filled with Leaves" and was required to allow Defendant a 60% commission on all U.S. sales and a 75% commission on all foreign sales.

18. Plaintiff entered into a contract with Defendant in or around April 2008. Her book was published and made available for sale in August of 2008.

19. Defendant claims that from August 2008 through September 2015, *only nine (9) copies* of "Ten Houses Filled with Leaves" were sold. The amount paid by Defendant to Plaintiff for those sales during that period was $10.20.

20. Because it is Defendant's practice and procedure to maintain but not share the records of authors' sales, Plaintiff had no way of verifying the actual sales numbers of her book.

21. Defendant tightly controls all of the orders, payments and fulfillment, without the involvement of the author, leaving Plaintiff with no choice but to trust the sales data that was reported by Defendant.

22. According to the Better Business Bureau, over the past three years, Defendant has had sixty-eight (68) complaints lodged against it.[2] In July 2021, a Dorrance Publishing author complained of the same practices that gives rise to Plaintiff's claims here:

> . . . I asked for report from different vendors for my reference and all Jessica kept saying was this is how many was sold not giving me proof from the different vendors. The whole ideal is to keep up with my own profits and have a report from all vendors so i will know what ill be getting instead of taking their word for it. I have been lied to several times by Dorrance all i want is proof real proof because on amazon it showed as my books being sold out and restock coming soon . . . I think they are covering up or lying about books sales? I want to know why they cant provided paperwork or proof coming from the vendors and not just what they say thats how people get cheated and lied to.

23. Similarly, in March 2021, another author complained that he was not getting accurate sales data from Defendant and that he knew that Defendant was under-reporting his sales:

> I have a problem to get the full All Book Sales report. I know for sure the number of books which were sold through Amazon, Barns and Noble, Walmart and in other countries are more than The DC

---

[2] *https://www.bbb.org/us/pa/pittsburgh/profile/publishers-book/dorrance-publishing-company-inc-0141-17000172/complaints*

5

> reported to me. I asked to send me the Sales report but Michael, a DP' representative refused it. He simply sent me the number of books which were sold. I wish to see the Sales report which they received from Amazon and other sites my book is on . . .
>
> So, according to their report from January 2020 until January 2021 only 1 book was sold!!!??? That is not true. My students, relatives, friends bought at least 50 books! Plus, my books are on Amazon, Barnes and Noble, Walmart, eBay, ****** **** and about 15 countries of the world: Germany (my friends bought 5 of them there!), Great Britain, Canada, Japan. Etc. That's why I want to know the real report not the false one!

24. Complaints about Defendant not remitting payments to authors for units sold can be found all over the internet. For example, On Complaints Board,[3] in March of 2016, an author complained that he had actual knowledge of sales of his book, but Defendant was claiming that none had been sold:

> I published my book with Dorrance/Rosedog in 2005. Things were going along pretty well until they signed on with Amazon to sell my book. Since then, I have not been paid for ANY of the books sold on Amazon. Rosedog Publishing swears no books have been sold, but I know of so many books being bought, the months they were bought, places, people, etc. I even had a Melbourne, Australia city library buy the book because I saw it on their shelves myself, yet still I have not been paid! When I contacted Amazon, they had no listing of me. Recently I was told the book had to go into its second printing because they had been sold out. I am beyond angry with this publishing company and want to know WHO has been getting the money for all these books that have been sold since at least 2007?

25. In August 2018, an author posted a similar complaint about Defendant hiding sales and refusing to remit royalties for books she knew were sold:

> Your company is a scam. You make all the money and tell me I am not selling books when I know 40 people who bought them on line. A publishing company that has an answering machine? Big flag. Mike Knapp and the rest of you have ignored all my calls. How can you sleep at night. How do you stay in business when so many

---

[3] *https://www.complaintsboard.com/dorrance-publishing-published-book-c801415*

> people give you four thousand dollars. All my hard work and my copyright. You have broken the contract. I do not want anything to do with your company and I have talked to the BBB You have not heard the last me.

26. In 2017, an author confirmed that instead of accounting for sales and paying royalties to the author, Defendant was sending false records showing that no sales had taken place, even though the author had confirmed otherwise:

> They've even sent me false records of sales that said your book had no sales this quarter. That's a big lie because I've had friends buy it and even I bought my own book so how can they say that there were no sales? That's a stupid statement because my friends and I have been buying copies. If they don't start sending my payments I may have to take legal action.

27. In March of 2021, another frustrated author caught Defendant lying about confirmable sales of his book:

> In 21 years I have only received $15.08 in royalties and Dorrance Publishing has made no attempt to pay me as per their contract. In 2013 I attempted to reach them and received nothing but a run around. I have been told that my book has not had enough sales to warrant payment?
>
> I want detailed records of the sales logs for the last 20 years. I have records that show sales and have even bought my own book on Amazon therefor I know they are being dishonest and I would like them held accountable.

28. It is clear, based on Plaintiff's experience with Defendant – and on the sample of publicly available complaints set forth above – that Defendant has a historical pattern and practice of failing to disclose the true and accurate sales of their customer's books. Defendant employs this practice through misrepresentation, intentional non-disclosure and purposeful concealment of the true sale data that Defendant alone controls.

29. Beginning in August of 2008, when Plaintiff's novel "Ten Houses Filled with Leaves" was first published and made available for sale, Defendant employed these very same deceitful and fraudulent practices on Plaintiff.

30. According to Defendant, only nine (9) copies of her book were sold from 2008 to 2015.

31. By letter dated September 2, 2015, Defendant notified Plaintiff that it was terminating Plaintiff's contract effective September 30, 2015, at which time Defendant would no longer be obligated to pay royalties to Plaintiff for any units sold.

32. Because Defendant controlled all the sales data and was actively concealing it from Plaintiff, she was unaware that "Ten Houses Filled with Leaves" was actually selling healthily both in the U.S. and abroad.

33. In fact, it was not until Fall of 2019, that Plaintiff became aware of the true sales of "Ten Houses Filled with Leaves." At that time, Plaintiff noticed that her book was still for sale on Amazon, even though Defendant had terminated her contract in 2015.

34. It was at that time that Plaintiff learned that she could access an Amazon feature called "Author Central" which reports the number of units sold and organizes the data by geographic region.

35. Plaintiff accessed the 4-week domestic sales report for "Ten Houses Filled with Leaves" for the period of April 9, 2012 through May 6, 2012 and was shocked to see that Amazon was reporting 51,133 copies of her novel sold in that four-week period.

36. The Amazon price for one copy of "Ten Houses Filled with Leaves" was $11.00, which means that during the same period, Plaintiff's novel had grossed $562,463.00 in the U.S. alone.

37. Under her agreement with Defendant, Plaintiff was entitled to receive 40% of that gross, or $224,985.20.

38. However, consistent with its fraudulent pattern and practice, Defendant reported *zero* sales for that same period, and paid *no* royalties to Plaintiff.

39. As of today's date, Plaintiff's novel is *still available for sale on Amazon*, yet she has still never been paid anything more than the total of $10.20 by Defendant.

40. In early 2020, Plaintiff sought assistance from the Pennsylvania Office of Attorney General's Bureau of Consumer Protection by filing a consumer complaint.

41. Defendant responded by e-mail dated July 14, 2020 to the Bureau of Consumer Protection by confirming that Defendant published and made available "Ten Houses Filled with Leaves" in August of 2008, and then Defendant terminated the contract without reservation in September of 2015.

42. The e-mail went on to re-acknowledge Defendant's claim that – for the entire run of the novel – Plaintiff had only earned $10.20. The e-mail also claims that after 2015, Defendant "would not have sold, distributed, or printed any further copies of [Plaintiff's] book."

43. The Bureau of Consumer Protection was forced to close Plaintiff's file in September of 2020 due to the refusal of Defendant to participate in voluntary mediation. Defendant never produced any sales data in connection with the Bureau of Consumer Protection's efforts.

**TOLLING OF THE LIMITATIONS PERIOD**

44. Defendant's misrepresentation, intentional non-disclosure and purposeful concealment of the conduct as set forth above, continuously tolls the commencement of the limitations period to file these claims.

**CLASS ACTION ALLEGATIONS**

45. Plaintiff brings this action on behalf of herself and all other persons similarly situated, pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following class:

> All natural persons residing within the United States who entered into a contract with Dorrance Publishing Company, Inc. or any of its affiliates (I-Proclaim Books, Red Lead Press, Rose Dog Books, and Whitmore Publishing Company) ("Defendant") and who were due to receive commissions from sales of books in the six-year period preceding the date of the filing of the Complaint, and which commissions Defendant failed to pay.
>
> Excluded from both Class are: (a) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns, and successors; (b) the judge to whom this case is assigned and any member of the judge's immediate family; and (c) individuals with claims for personal injury, wrongful death and/or emotional distress.

46. **Numerosity**: The members of the Class are so numerous joinder of them all is impracticable. Based on the number of publicly available complaints against Defendant regarding undisclosed sales data and failure to pay commissions, there are at least forty (40) members of the Class. Although Defendant controls the exact data, it is estimated that at least one-hundred (100) authors fit the class definition and are members of the Class. The identity of each author can be readily ascertained from Defendant's records. Class Members can be notified of this class action via publication and U.S. mail, e-mail, social media forums, through e-mail addresses which Defendant has in their business records or other records in their possession, custody or control.

47. **Commonality and Predominance**: There are common questions of law and fact that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, include, but are not limited to, the following:

(a) Did Defendant have a policy and practice of failing to disclose accurate sales data to its authors?

(b) Did Defendant fraudulently withhold sales data from its authors?

(c) Did Defendant fraudulently and systematically fail to remit payment to authors for units that were sold but not reported by Defendant?

(d) Did Defendant have a policy and practice of misleading authors and covering up its fraudulent practices when authors questioned the sales data reported by Defendant.

(e) Does Defendant's conduct violated the New Jersey Consumer Fraud Act?

48. **Typicality**: The claims of the individual named Plaintiff are typical of the claims of the Class in that Plaintiff alleges a common course of conduct by Defendant toward members of the Class. Defendant systematically under reported sales to authors so as to deny authors the commissions due, and so as to increase the profits realized by Defendant. Plaintiff and the other members of the Class seek identical remedies under identical legal theories, and Plaintiff's claims do not conflict with the interests of any other members of the Class in that the Plaintiff and the other members of the Class were subject to the same conduct and suffered the same harm.

49. **Adequacy**: Plaintiff will fairly and adequately represent the interests of the Classes. Plaintiff's claims are coextensive with, and not antagonistic to, the claims of the other members of the Classes. Plaintiff is committed to the vigorous prosecution of the claims of the Class and has retained attorneys who are highly qualified to pursue this litigation and have experience in class actions, including consumer protection actions.

50. **Superiority**: Certification under Rule 23(b)(3) will also be appropriate because a class action is superior to other available methods for the fair and efficient adjudication of this

controversy given the relatively small amount of fees imposed on consumers, the complexity of the issues involved in this litigation, the enormity of Defendant's business, and the significant costs of litigation, and absent a class action, it is very likely prosecution of the claims set forth herein would not occur.  Furthermore, since joinder of all members is impracticable, a class action will allow for an orderly and expeditious administration of the claims of the Class and will foster economies of time, effort and expense.

51.     **Rule 23(b)(2):** As an alternative to or in addition to certification of the Class under Rule 23(b)(3), class certification will be warranted under Rule 23(b)(2) because Plaintiff seeks injunctive relief on behalf of the members of the Class on grounds generally applicable to the entire Class in order to enjoin and prevent Defendant's ongoing practice of fraudulently withholding and mis-reporting sales data to authors.

52.     Because Plaintiff seeks injunctive relief for Class Members, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members which would establish incompatible standards of conduct for Defendant.  Further, adjudications with respect to individual Class Members would, as a practical matter, be dispositive of the interests of other Class Members who are not parties to the adjudication and may impair and impede their ability to protect their interests.

53.     Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

54.     Plaintiff does not anticipate any difficulty in the management of this litigation.

**COUNT ONE**
**(VIOLATION OF THE CONSUMER FRAUD ACT)**
**(N.J.S.A. 56:8-1 *et seq.*)**

55. Plaintiff repeats and realleges all prior allegations as if set forth at length herein.

56. Defendant engaged in unconscionable commercial practices, deception, fraud and misrepresentations in connection with Defendant's non-disclosure and false reporting of actual book sales to Plaintiff, in violation of the Consumer Fraud Act ("CFA") at N.J.S.A. 56:8-2.

57. Plaintiff is a "person" within the meaning of N.J.S.A. 56:8-1(d), which includes, among other things, "any natural person or his legal representative, partnership, corporation, company, trust, business entity or association . . ."

58. Defendant is also a "person" under the meaning of N.J.S.A. 56:8-1(d), which includes, among other things, "any natural person or his legal representative, partnership, corporation, company, trust, business entity or association . . ."

59. Defendant committed an unconscionable act and deceptive business practice in violation of the CFA by deliberately hiding and failing to disclose actual book sales to Plaintiff, and falsely reporting only negligible sales to Plaintiff in order to maximize profit to to Defendant itself. Defendant's unconscionable acts deprived Plaintiff of the fruits of her intellectual and creative labor, which was further aggravated because Defendant's scheme worked an immeasurable emotional harm on Plaintiff as an author.

60. Specifically, Defendant informed Plaintiff that, since 2008, only nine (9) copies of her novel had been sold, when in reality tens of thousands of copies of Plaintiff's novel had actually been sold. In fact, for the period of April through May, 2012, a total of 51,133 copies of Plaintiff's book were sold. Defendant had hidden all sales records from Plaintiff – as is Defendant's policy and procedure – and had retained all profits as well.

61. Dorrance actively hid Plaintiff's true sales from her and deceived her into thinking that her book had virtually no sales, all the while retaining the revenue from the substantial sales numbers that Plaintiff's book was actually generating.

62. Based on all representations made by Defendant that it would market, distribute and handle all of the payments for, and fulfillment of, all orders, Plaintiff reasonably relied on Defendant to accurately monitor and report actual sales data to her. Defendant placed itself in a position where Defendant – not Plaintiff – had exclusive access to the sales data and reporting. Plaintiff relied on Defendant to accurately disclose to her the true sales of her book. Instead, Defendant elected not to disclose the true sales, so as to keep 100% of the profits for themselves.

63. As a direct and proximate result of the foregoing unlawful and unconscionable business practices engaged in by Defendant as specifically described above, Plaintiff suffered ascertainable losses, including but not limited to $224,985.20, which is the 40% commission to which she was entitled for the 51,133 domestic sales of her book on Amazon price for just one four-week period in 2012.

64. The foregoing conduct engaged in by Defendant constitutes an unconscionable business practice that violates the New Jersey Consumer Fraud Act and proximately cause the ascertainable loss suffered by Plaintiff.

## COUNT TWO
### (BREACH OF CONTRACT)

65. Plaintiff repeats and realleges each and every of the foregoing allegations as if set forth at length herein.

66. This cause of action is plead in the alternative to Plaintiff's Consumer Fraud Act claim as alleged in Count One of this Complaint.

67. Plaintiff entered into a contract with Defendant in April of 2008.

68. Pursuant to that contract, Defendant agreed to publish, print, market and distribute Plaintiff's novel. In return, Defendant was to retain 60% of all domestic sales and 75% of all international sales.

69. For the period of August 2008 through 2015, Defendant fraudulently reported that Plaintiff had only sold nine (9) copies of "Ten Houses Filled with Leaves" when in reality, at least 51,133 copies had been sold domestically within that period of time. Defendant purposefully failed to disclose the true sales of Plaintiff's novel and failed to pay Plaintiff the 25% commission due for those domestic sales, in breach of the parties' contract.

70. The contract, at Section VII, obligates Defendant to send the author "statements of any sales made and remit the author's payments from the sale of the work on January 31, and July 31 of each year." Defendant's failure to accurately disclose sales made and failure to remit payment to Plaintiff is a breach of Defendant's obligations under Section VII of the contract.

71. Plaintiff is not in breach of the contract, and had in fact performed each and every of her obligations thereunder, including payment to Defendant of $8,000.00.

72. Because Defendant had exclusive control over sales records, and had deliberately concealed those records from Plaintiff as part of its scheme to wrongfully retain profits, Plaintiff did not know – and could not have known even with the exercise of reasonable diligence – that Defendant had breached the contract and that she had suffered an injury because of Defendant's breach, until Fall of 2019.

73. Plaintiff has made demand to Defendant to compensate her for the loss in value that Defendant's actions caused, but Defendant has refused.

**WHEREFORE**, Plaintiff, on behalf of herself and all others similarly situated, demands judgment against the Defendants, as follows:

(A)  Certifying the proposed Class, as defined herein, pursuant to Fed. Civ. P. Rule 23(b)(2) and (3), and naming Plaintiff as class representative and her undersigned counsel of record as Class Counsel;

(B)  On behalf of the Class, ordering injunctive relief prohibiting Defendant from future violations of the Consumer Fraud Act and enjoining Defendant to provide an accounting of all Class Members' sales records for the relevant period;

(C)  On behalf of the Class, ordering disgorgement and restitution to Plaintiff and the Class Members of all monies received and retained by Defendant that was properly due to Class Members;

(D)  On behalf of the Class, awarding actual, consequential, punitive, statutory, and treble damages;

(E)  On behalf of the Class, awarding all damages allowed by common law, statute, and otherwise;

(F)  On behalf of the Class, awarding reasonable costs and attorneys' fees;

(G)  On behalf of the Class, awarding applicable pre-judgment and post-judgment interest;

(H)  On behalf of the Class, awarding all such other and further relief as Plaintiff and the Class may be entitled or as the Court deems equitable and just.

## NOTICE TO ATTORNEY GENERAL OF ACTION

A copy of this Complaint will be mailed to the Attorney General of the State of New Jersey within 10 days after the filing with the Court, pursuant to N.J.S.A. § 56:8-20.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

**CERTIFICATION PURSUANT TO RULE 11.2**

Pursuant to Rule 11.2, I hereby certify, to the best of my knowledge, that the matter in controversy is not the subject of any other action pending in any court or the subject of a pending arbitration proceeding, nor is any other action or arbitration proceeding contemplated.

Dated: May 19, 2022						/s/ David J. DiSabato
								David J. DiSabato, Esq.
								**DiSABATO & CONSIDINE LLC**
								P.O. Box 370
								Rutherford, New Jersey 07070
								Phone: 201.762.5088
								Fax: 973.453.0338
								ddisabato@disabatolaw.com

								*Attorneys for Plaintiff Tina Lockhart*
								*On behalf of herself and the putative classes*